OPINION OF THE COURT
Abbey L. Borlan, J.
On September 21, 1988, defendant Shi Fu Huang was indicted for the crimes of murder in the second degree (two counts) and burglary in the second degree.
On September 18 and 19, 1989, a hearing pursuant to Frye v *514 United States (293 F 1013 [DC Cir 1923]) was held to determine the admissibility of "DNA [deoxyribonucleic acid] Fingerprinting”. New York follows the standards for admissibility set forth in Frye. (People v Middleton, 54 NY2d 42 [1981].)
The decision reached in any criminal case on the admissibility of scientific evidence is of vital importance since it has a significant potential for influencing a jury and greatly increases the likelihood of an erroneous verdict.
Although no appellate court in New York has ruled on the admissibility of DNA evidence, the trial courts of the State have begun to grapple with the extremely complex issues involved. (People v Wesley, 140 Misc 2d 306 [Albany County Ct 1988]; People v Lopez, NYU, Jan. 6, 1989, at 29, col 1 [Sup Ct, Queens County 1988]; People v Castro, 144 Misc 2d 956 [Sup Ct, Bronx County 1989]; People v Gonzalez, NYU, Aug. 18, 1989, at 22, col 2 [Suffolk County Ct].)
Testifying for the People at the hearing were Dr. Michael Baird, director of forensic and paternity testing at Lifecodes Corp., an expert in the fields of genetics, molecular biology and population genetics; and Ms. Deborah Vining, a senior forensic scientist at Lifecodes. The defense called no witnesses.
Dr. Baird stated that it is the underlying principle of the DNA Print System (Lifecodes’ trademark name) that every individual, other than an identical twin, has a unique configuration of DNA in every cell that contains a nucleus. Additionally, each individual has the same DNA makeup in every cell containing a nucleus. DNA is found in the white cells of human blood but not in the red cells which do not have nuclei. The evidentiary samples that were submitted to Life-codes Corp. for analysis, labeled 15602-15606, were blood samples and were divided as follows:
15602: a vial of a known sample of Shi Fu Huang’s blood taken pursuant to court order.
15603: a blood swatch on a shirt.
15604: a small storage tube.
15605: a storage tube (HEM No. 15).
15606: a black ski hat with a blood stain.
The court in this opinion will not detail the background and development of the theory of DNA identification since it is not in controversy at this hearing and has been extensively and thoroughly detailed in New York case law and has found general scientific acceptance. (See, for example, People v Castro, supra; People v Gonzalez, supra.)
*515 Dr. Baird provided detailed testimony with respect to the six steps or techniques used to produce a DNA print.
The court will briefly list the six steps:
1. The Extraction and Isolation of DNA
In this step the DNA is chemically extracted from the evidentiary samples.
2. The Fragmentation (or "cutting”) of the DNA
In this step the DNA is cut into individual fragments by the use of an enzyme. (The enzyme used in this case was PsTI).
3. Gel Electrophoresis (or "separation” of the fragments)
The fragments are placed in a chemically charged flat gelatin surface containing an agarose gel. The gel is placed in an electric field, positive at one end and negative at the other. The DNA fragments which carry a negative charge flow toward the positive end of the gel. The particles arrange themselves according to size; the larger at the top, the smaller migrate towards the bottom.
4. Southern Blotting
The DNA fragments are chemically split-apart into two strands separating the four chemicals within the DNA (A, C, G, T). The pattern formed is transferred to a nylon membrane.
5. Hybridization
Probes are tagged with a radioactive marker and applied to the membrane. When a probe finds a DNA fragment that carries its complimentary strand, it will bind to that fragment. In this case, Lifecodes used five polymorphic probes and two nonpolymorphic probes. It is the uncontroverted testimony that the probes used are accepted by the scientific community and have been subjected to peer review.
6. Autoradiography
After the excess probes are removed and the radioactively marked membrane is taken from the hybridization solution, the membrane is placed against an X-ray film and exposed. Bands appear where the radioactive probes stuck to the fragments. The completed film is often referred to an an "autorad”.
All six steps have been recognized as reliable and have gained general acceptance in the scientific community.
Ms. Vining testified that she followed the six procedures outlined above, as well as the Lifecodes protocol for those procedures. The Lifecodes protocol was not challenged by the *516 defendant. Furthermore, there was no evidence controverting the correctness of the procedures employed by Ms. Vining. She stated that based on her review of the autorads, sample 15605 had degraded because of bacterial contamination. There could, therefore, be no reading as to that sample. However, she testified to a match of sample 15602 (the known sample of defendant’s blood) with samples 15603, 15604, and 15606. Sample 15604 showed some degrading, but nothing exculpatory. Dr. Baird testified that it is impossible to get a false positive reading. Environmental effects could at worst result in "no result”, but never in a false positive reading.
Ms. Vining’s work was supervised and reviewed by Dr. Baird who agreed with her findings.
There is no evidence controverting the correctness of the visual match of the autorads.
To interpret the meaning of a match, forensic scientists apply population genetic principles, i.e., they statistically interpret the meaning of the match.
If there is an adequate and reliable data base, a forensic scientist can calculate that a match did not occur by chance.
In this case, the data base of Lifecodes Corp. consisted of 167 blood samples, taken from approximately 200, brought to Lifecodes from mainland China by a Chinese scientist, Dr. Ming Jun Liu.[1] Dr. Jun had been directed by Dr. Baird to bring the samples when she came to Lifecodes Corp. on sabbatical leave. Dr. Baird testified that 200 individual samples are the amount usually required for a valid statistical analysis of an ethnic group. The frequency of the fragments would be different in different ethnic groups.
Although Dr. Jun was not available to testify as to the source of the blood samples and whether they were indeed random samples of members of the Chinese ethnic group, Dr. Baird testified that he was advised by Dr. Jun that the samples were from a blood bank in China. Ms. Vining testified that she was told by Dr. Jun that they were from university students.
Dr. Baird testified further that he believed Dr. Jun because she is a scientist and it is often necessary to depend on other scientists to provide blood samples for scientific studies. In addition, the samples appeared on analysis to be from unre *517 lated individuals. Based on the number of alleles,[2] they also "seemed” to be from a random sampling of the population.
Dr. Baird concluded that, specifically with respect to the Chinese data base, an individual possessing the banding pattern in the instant case would occur in roughly 1 in 20 billion individuals. (There is a world population of five billion.)
Because of the size of the data base, Dr. Baird calculated that the range statistically could be between 1 in 2Vi billion to one in several trillion.
If the same pattern were compared to a Black or Caucasian population, the frequency of the pattern would be much rarer.
The following are the court’s conclusions of law:
DNA fingerprinting is a reliable scientific theory that has gained general acceptance in the scientific community.
The six-step procedure used to extract and analyze samples of DNA as previously enumerated has also gained general acceptance in the scientific community.
In the present case, the six steps in the protocol were properly applied and the visual match is admissible in evidence.
Although the court expressed concern for the number of samples comprising the Chinese statistical data base, as well as its scientific reliability, the court concludes that, since defendant offered no expert testimony to contradict Dr. Baird’s conclusions, the sample was sufficient and reliable. The court will not preclude its admission as a matter of law but will submit the ultimate question of the adequacy of the size of the sample and its scientific reliability to the jury. The issues raised relate to the weight rather than admissibility of the evidence. At trial, defendant will have the opportunity to call expert witnesses and to litigate those issues. However, since the data base sample was under 200, the figure given by Dr. Baird as the suggested minimum, the court will only allow testimony as to the lowest figure of probability, namely, one billion to one.

. An allele is one of a group of genes that occur alternately at a specific site on a chromosome.

. The doctor was referred to as Dr. Ming Jun during the hearing, and will be referred to by that name throughout this decision.