[No. 58282-3.   En Banc.   February 25, 1993.]

THE STATE OF WASHINGTON, *Respondent*, v. RICHARD C. CAUTHRON, *Appellant*.

*Peter T. Connick,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine* and *Paul Stern, Deputies,* for respondent.

*Jon E. Ostlund, Whatcom County Public Defender,* amicus curiae for appellant.

*Christine O. Gregoire, Attorney General,* and *S. Kim O'Neal, Assistant,* amicus curiae for respondent.

*Philip A. Talmadge* and *Robert G. Nylander* on behalf of Cellmark Diagnostics, amicus curiae for respondent.

DURHAM, J. — Richard Cauthron appeals his conviction on seven counts of first degree rape. He argues that evidence of DNA typing was improperly admitted at trial. We affirm the trial court's decision that the scientific principle and the restricted fragment length polymorphism (RFLP) method of DNA typing are universally accepted, and therefore admissible. However, we reverse the conviction because testimony that Cauthron's DNA "matched" the perpetrator was admitted in error, in that it was unsupported by valid probability statistics. We remand for further consideration of the statistical evidence in accordance with our opinion.

In 1986 and 1987, a series of 20 to 25 rapes were committed in Everett under similar circumstances. In some of the cases, the perpetrator would come up to his victim's car

while she was at a stop and force her to move over at gunpoint. In others, the perpetrator would come up behind the victim and lead her to his own car. In each instance, the rapist wore a mask and cloth gloves, and carried a small black handgun.

Generally, the victim would be forced to undress totally. She would then be directed to use her own clothing to blindfold herself. The rapist would often touch his victim's breasts and genitals, and then force her to perform oral sex on him at gunpoint (except in one case, where he vaginally raped his victim). The perpetrator would then order his victim to pose while he took pictures of her, and would threaten to show the pictures all around town if she told anyone about the crime.

In the early morning hours on October 14, 1988, Everett police received a call that a man was seen in the bushes at a fast food restaurant wearing a ski mask and masturbating. When an officer reached the scene, he discovered Cauthron in the bushes. His pants were undone, except for the top button, and the officer could see the defendant's pubic hair and part of his penis. A search of the bushes turned up a ski mask, a pair of green wool gloves, and a black gun that turned out to be a plastic replica. Cauthron's car was found about two blocks away with the keys in the ignition and the door partially open. The officers on the scene believed that Cauthron was the serial rapist they were looking for. Cauthron was handcuffed and taken to the police station for further questioning. At the station, he consented to give a blood sample which was used for conventional and DNA blood testing. He also allowed police to search his car. He was fingerprinted and released that same day. After further investigation, Cauthron was charged with seven counts of rape.

Prior to trial, in late February and early March 1989, the court held a lengthy hearing to decide the admissibility of DNA typing evidence. Under the *Frye* standard for novel evidence, scientific evidence will be admitted only if it is generally accepted in the relevant scientific community. *See*

*Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923). The State offered four witnesses to prove the acceptability of DNA testing: Robin Cotton, Ph.D. Molecular Biology and Biochemistry, manager of Research and Development at Cellmark, the forensic DNA laboratory used to test Cauthron's blood; Pat Concannon, Ph.D. Biology, Virginia Mason Research Center; Gerard Schellenberg, Ph.D. Biochemistry, University of Washington School of Medicine; and Ellen Wijsman, Ph.D. Theoretical Genetics, University of Washington.[1] The defense offered five witnesses to show that DNA evidence should not be admitted: Simon Ford, Ph.D. Biochemistry, University of California at Irvine; Randy Libby, Ph.D. Genetics, University of Washington; William Thompson, Ph.D. Psychology, J.D., University of California, Irvine; Laurence Mueller, Ph.D. Ecology, Population Geneticist, University of California, Irvine; and Seymour Geisser, Ph.D. Mathematical Statistics, University of Minnesota.

The trial court found that both the scientific principle of DNA and the RFLP process (discussed below) are universally accepted in the scientific community. As to the additional problems raised by defense witnesses with respect to the laboratory procedures used here and the validity of the statistical evidence, the trial court ruled that those issues went to the weight rather than the admissibility of the testimony. The court denied defendant's motion to suppress the DNA evidence.

At trial, DNA typing evidence was introduced through expert testimony by both the State and the defense. The testimony showed that there was a "match" in five of the seven cases between the semen recovered from the clothing of the victims or the crime scene and Cauthron's blood.

The State also introduced the testimony of the victims, although none was able to identify her assailant. In addition,

---

[1] It should be noted that there were some differences between the experts presented for both the State and the defense at trial and at the *Frye* hearing.

more traditional blood tests were admitted, through expert testimony. Because of a rare enzyme present in several samples of the rapist's semen, the expert testified that less than 1 percent of the population could have deposited the semen. Cauthron's blood was found to contain this particular enzyme. Cauthron was convicted of all seven counts. He was sentenced to 68 months on five of the seven counts, and an exceptional sentence of 136 months was given in two of the counts, to be served consecutively under RCW 9.94A.400-(1)(b).

Cauthron appealed and we accepted certification from the Court of Appeals. After oral argument, but before the court issued its opinion, we requested additional briefing on the applicability of a National Academy of Sciences document: Committee on DNA Technology in Forensic Science, *DNA Technology in Forensic Science* (National Academy Press 1992) (hereinafter *DNA Technology*). A committee of eminent scientists and jurists (hereinafter Committee) exhaustively researched and analyzed the current status of forensic DNA typing.

Because of the complexity of the subject matter, an outline of our analysis may be helpful. We begin our opinion with an explication of the *Frye* standard for admissibility of novel scientific evidence, and we renew our longstanding adherence to that test. We then determine that the proper standard of review of the trial court's decision in that regard is de novo. In addition, we recognize that once the *Frye* question is resolved, the admission of expert testimony is within the trial court's discretion. Under ER 702, expert testimony may be admitted if the witness qualifies as an expert and the expert testimony will be helpful to the jury.

We next review both the RFLP test for DNA typing, and the statistical evidence used to compute the significance of a "match" using the standards set forth above. First, we explain the RFLP procedure of DNA typing, and then determine that it is generally accepted in the scientific community, and therefore meets *Frye*. Second, we hold that the

trial court acted within its discretion when it admitted the expert testimony pertaining to the RFLP test over defense objections that the evidence was unreliable.

We then turn to an examination of the statistical evidence. Upon review of the relevant sources, we find significant disagreement within the scientific community regarding the validity of the databases used to construct the probability estimates which ultimately determine identity. As a result we conclude that the expert testimony of a "match" was admitted in error, since it was not accompanied by statistical verification. We therefore reverse the conviction, but we remand for reconsideration of the statistical evidence in light of current scientific knowledge.

I

STANDARDS OF ADMISSIBILITY

■ In Washington, we have adopted the standard for determining if evidence based on novel scientific procedures is admissible set forth in *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923). The rule is settled:

> [E]vidence deriving from a scientific theory or principle is admissible only if that theory or principle has achieved general acceptance in the relevant scientific community.

*State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984). Although we recognize that several jurisdictions have rejected the *Frye* test in favor of a more liberal test of admissibility based on the relevance standard of the Federal Rules of Evidence, we continue to employ it.[2] The classic statement of the test is found within *Frye* itself:

---

[2]Conversely, some commentators recommend that courts adopt the test from *United States v. Downing*, 753 F.2d 1224, 1238 (3d Cir. 1985). There, the court fashioned a 3-part test focusing on the reliability of the procedure. Joseph G. Petrosinelli, Comment, *The Admissibility of DNA Typing: A New Methodology*, 79 Geo. L.J. 313 (1990-1991). We have consistently applied the *Frye* test, however. The *Frye* test is more conservative than the reliability test; that is, the court is less inclined to admit evidence which is still disputed in the scientific community. *See* Edward W. Cleary, *McCormick on Evidence* § 203, at 607-09 (3d ed. 1984). Thus, in making the initial determination to allow novel scientific evidence, we do not examine its reliability, but instead focus on whether it is generally accepted in the scientific community.

> Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

*Frye*, at 1014.

Under *Frye*, a court is to determine if the evidence in question has a valid, scientific basis. Because judges do not have the expertise required to decide whether a challenged scientific theory is correct, we defer this judgment to scientists. This inquiry turns on the level of recognition accorded to the scientific principle involved — we look for *general acceptance* in the appropriate scientific community. *See Jones v. United States*, 548 A.2d 35, 42 (D.C. 1988). If there is a significant dispute between qualified experts as to the validity of scientific evidence, it may not be admitted.

■ ■ We review the trial court's decision to admit or exclude novel scientific evidence de novo. A number of courts in other jurisdictions have adopted this approach. *See State v. Fenney*, 448 N.W.2d 54, 58 (Minn. 1989); *Jones*, at 40 (citing cases). The standard of review of *Frye* determinations was discussed by a California court in *People v. Reilly*, 196 Cal. App. 3d 1127, 242 Cal. Rptr. 496 (1987). There, the issue was whether to admit electrophoretic testing of dried bloodstains. Applying *Frye*, the court characterized the issue as a mixed question of law and fact. *Reilly*, at 1134. The court said:

> The issue, recently paraphrased as whether "a consensus of scientific opinion has been achieved" . . . is factual but not entirely so for purposes of review. The trial court's determination cannot be sustained, for example, on a mere finding that the record contains " 'sufficient evidence' " of the reliability of the challenged method.
>
> The reviewing court undertakes a more searching review — one that is sometimes not confined to the record. Because it is impractical to parade a true cross-section of scientists before the court, the scientific literature may be considered on the

ultimate issue of consensus. . . . Law articles, too, may be considered for that purpose.

(Citations omitted.) *Reilly*, at 1134. Decisions from other jurisdictions may be examined as well, but the relevant inquiry is the general acceptance by scientists, not by the courts. *Reilly*, at 1135. In Washington, the court has previously examined "both the literature on the subject and the opinions of other jurisdictions for guidance." *State v. Black*, 109 Wn.2d 336, 342, 745 P.2d 12 (1987) (discussing the scientific literature pertaining to "rape trauma syndrome"); *Martin*, at 721-22 (examining the literature on hypnosis). Thus, we examine the record, available literature of law reviews and other journals, and the cases of other jurisdictions.[3]

Cauthron urges us to adopt an alternative method of analyzing the admissibility of DNA typing, relied on by several courts in other jurisdictions. Some have ruled that even though the DNA test is reliable in a general sense (*i.e.*, it meets *Frye*), the forensic applications were not sufficiently reliable to be admissible. *See, e.g., United States v. Two Bulls*, 918 F.2d 56, 60-61 (8th Cir. 1990), *vacated and appeal dismissed*, 925 F.2d 1127 (1991); *State v. Schwartz*, 447 N.W.2d 422, 428 (Minn. 1989); *see also* John Caleb Dougherty, Comment, *Beyond* People v. Castro: *A New Standard of Admissibility for DNA Fingerprinting*, 7 J. Contemp. Health L. & Pol'y 269 (1991). The most-often cited of this line of cases is a trial court opinion, *People v. Castro*, 144 Misc. 2d 956, 959, 545 N.Y.S.2d 985 (Sup. Ct. 1989). We do not agree with the approach advocated by the court there. *Castro*, 144 Misc. 2d at 959, employed a 3-part analysis:

> *Prong I.* Is there a theory, which is generally accepted in the scientific community, which supports the conclusion that DNA forensic testing can produce reliable results?

---

[3]Once this court has made a determination that the *Frye* test is met as to a specific novel scientific theory or principle, trial courts can generally rely upon that determination as settling such theory's admissibility in future cases. However, trial courts must still undertake the *Frye* analysis if one party produces new evidence which seriously questions the continued general acceptance or lack of acceptance as to that theory within the relevant scientific community.

> *Prong II.* Are there techniques or experiments that currently exist that are capable of producing reliable results in DNA identification and which are generally accepted in the scientific community?
> *Prong III.* Did the testing laboratory perform the accepted scientific techniques in analyzing the forensic samples in this particular case?

The court answered the first inquiry, which it identified as a *Frye* issue, in the affirmative, holding that there was unanimous agreement among the scientists that DNA identification is capable of producing reliable results. *Castro,* at 963. After explaining the testing procedures used in detail, the court examined particular problems in several areas. *Castro,* at 969-72. It concluded, however, that the tests and procedures used are reliable and accepted in the scientific community. *Castro,* at 972. Ultimately, though, the court determined that the testing laboratory (Lifecodes) "failed to conduct the necessary and scientifically accepted tests . . .". *Castro,* at 977. Insufficient controls were employed, and inconclusive tests were not redone. The court therefore excluded the challenged DNA typing tests. *Castro,* at 977-78.

The *Castro* analysis is inappropriate in jurisdictions utilizing the *Frye* standard of admissibility. The core concern of *Frye* is only whether the evidence being offered is based on established scientific methodology. This involves both an accepted theory and a valid technique to implement that theory. It is important to distinguish, however, between the general acceptance of the methodology, and the acceptance of the results of a particular study or of the laboratory testing procedures in the case before the court — prong 3 of the *Castro* analysis. The *Frye* test is concerned only with the former — prongs 1 and 2. If the particular technique is sufficiently accepted in the scientific community at large, any remaining concerns about the possibility of error or mistakes being made in the case at hand can be argued to the factfinder.

■ In addition to the admissibility of the DNA evidence under *Frye,* the trial court must also analyze whether the admitted testimony was proper expert testimony. That is,

once the *Frye* determination has been made, a party's objection to the evidence should be analyzed under the usual standards for admission of evidence. ER 702, regarding expert testimony, provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

The determination of whether expert testimony is admissible is within the discretion of the trial court. Unless there has been an abuse of discretion, this court will not disturb the trial court's decision. *State v. Swan*, 114 Wn.2d 613, 655, 790 P.2d 610 (1990), *cert. denied*, 111 S. Ct. 752 (1991).

The 2-part test to be applied under ER 702 is whether: (1) the witness qualifies as an expert and (2) the expert testimony would be helpful to the trier of fact.[4] Part 2 of this standard should be applied by the trial court to determine if the particularities of the DNA typing in a given case warrant closer scrutiny. If there is a precise problem identified by the defense which would render the test unreliable, then the testimony might not meet the requirements of ER 702 because it would not be helpful to the trier of fact. In other words, although the possibility of a mistake or human error in a particular case is indeed pertinent, the trial court is best suited to address these factual matters. Moreover, these concerns are not properly a part of the *Frye* analysis, but are within the discretion of the trial court.

---

[4]We recognize that we have previously enunciated the test to be applied as a 3-part test. *See State v. Swan*, 114 Wn.2d 613, 655, 790 P.2d 610 (1990), *cert. denied*, 498 U.S. 1046 (1991); *State v. Allery*, 101 Wn.2d 591, 596, 682 P.2d 312 (1984). However, the second step of that test was a *Frye* determination. Because we review a *Frye* determination de novo, but review issues under ER 702 only for abuse of discretion, we find it inappropriate to include a *Frye* determination as part of the test for proper admissibility of expert testimony under ER 702. To reiterate, trial courts should initially make a *Frye* determination as to the general acceptance of the scientific principle underlying the expert's proposed testimony. Once the court is satisfied that there exists general acceptance in the appropriate scientific community, the court should look to ER 702 to determine the admissibility of the expert's testimony.

The task in this case is obviously an enormous one. The required scientific and legal materials are voluminous and complex. We are aided in our endeavor by the thorough work of the trial court. The record in this case is contained in some 22 volumes of transcript, exclusive of voir dire. The *Frye* hearing lasted 6 days and is contained in approximately 1,000 pages of testimony. Hundreds of additional pages of discovery are available. The briefs, including several from amicus, have also been helpful in understanding and analyzing the questions presented.

## II
### DNA TYPING

In examining the admissibility of the RFLP process, two distinct areas of inquiry are important. First, the court must decide if, as a matter of law, DNA typing is sufficiently well established in the scientific community so as to be generally admissible under the *Frye* test. Second, the court must decide if the trial court abused its discretion in admitting expert testimony about DNA typing in this particular case. A detailed understanding of the DNA process is required to make these determinations.

DNA (deoxyribonucleic acid) is the chemical material contained within an organism's cells which determines that organism's physical composition.[5] Human cells each contain

---

[5]The explanation given here is commonly recited in cases and articles. We have relied heavily on the Committee's report, *DNA Technology, supra.* The version presented in this portion is condensed and synthesized from Laurel Beeler & William R. Wiebe, Comment, *DNA Identification Tests and the Courts*, 63 Wash. L. Rev. 903 (1988). *See also* Linda R. Adkison, *DNA Fingerprinting: A Scientific Perspective*, 42 Mercer L. Rev. 1099 (1991); John Caleb Dougherty, Comment, *Beyond* People v. Castro: *A New Standard of Admissibility for DNA Fingerprinting*, 7 J. Contemp. Health L. & Pol'y 269 (1991); Paul C. Giannelli, *Criminal Discovery, Scientific Evidence, and DNA*, 44 Vand. L. Rev. 791 (1991); Edward J. Imwinkelried, *The Debate in the DNA Cases Over the Foundation for the Admission of Scientific Evidence: The Importance of Human Error as a Cause of Forensic Misanalysis*, 69 Wash. U. L.Q. 19 (1991); Janet C. Hoeffel, Note, *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant*, 42 Stan. L. Rev. 465 (1989-1990); Joseph G. Petrosinelli, Comment, *The Admissibility of DNA Typing: A New Methodology*, 79 Geo. L.J. 313 (1990-1991).

46 chromosomes, which are arranged in 23 pairs. One chromosome in each pair is inherited from each parent. Approximately 100,000 genes are located on the chromosomes. Genes, which consist of DNA, determine eye, hair, and skin color, the organization of body parts, and virtually everything else about our physical state. Each individual, with the exception of identical twins, has a unique DNA structure which is contained in every nucleated cell. That structure remains constant throughout a human lifetime. It can be found in blood, semen, hair, bone marrow, and other tissues.

The molecular structure of the DNA molecule is usually referred to as a "double helix". Thus, it resembles a ladder which is twisted like a spiral staircase. Each DNA molecule, if stretched to its full length, would measure approximately 6 feet. The sides of the ladder are composed of alternating molecules of sugar (s) and phosphate (p). The rungs consist of pairs of molecules called bases. There are only four kinds of bases: adenine, thymine, guanine, and cytosine. They are referred to by the letters A, T, G, and C. The bonding of these bases can occur in only a specified way, making up four "base pairs": A can pair only with T, forming A-T or T-A, and C can pair only with G, forming C-G or G-C. A crude diagram may help to visualize it:

```
s p s p s p s p s p s p s p s p s p s p s p s p s
T   A   G   C   C   C   T   A   G   A   T   G   G
|   |   |   |   |   |   |   |   |   |   |   |   |
A   T   C   G   G   G   A   T   C   T   A   C   C
  s p s p s p s p s p s p s p s p s p s p s p s p s
```

In each DNA molecule, there are approximately 3 billion base pairs. It is the precise order of these pairs that determines the unique traits of an individual. The analogy of computer data may be useful to understand this. All data in a computer is stored in terms of 0's and 1's. It is the precise order of only those two numbers that determines all the information contained within a computer program and its attendant data. Of course, not every segment of the DNA molecule varies from one individual to the next. We each

have genes which determine that we have two arms, two legs, a liver, a heart, and so forth. Moreover, the varying segments may have only few and small variations; *e.g.*, there are a limited number of eye colors. However, some portions of the DNA are highly variable, called polymorphic sites. These segments are referred to as "restricted fragment length polymorphisms" or "RFLP". Each version of a polymorphic gene is called an "allele". These form the basis for DNA typing.

There are several basic steps to DNA typing.[6] First, the DNA must be extracted from the cells. Second, the DNA is cut into fragments. Third, the fragments are separated by size. Fourth, the DNA fragments are transferred onto a membrane and denatured, or split in half lengthwise. Fifth, a radioactive probe is put on the membrane in a step called hybridization. Sixth, the membrane is x-rayed to make an autoradiograph (autorad), a picture of the DNA. Finally, the autorad is interpreted. Each step will be explained in turn.

DNA extraction involves both removing cells of interest from the objects to which they are attached (clothing, blood samples, etc.) and removing the DNA from inside the cell. Various enzymes and chemicals are used in this process. Part of this step is to then determine if there is a sufficient amount of DNA to test. The DNA must not be too degraded or too contaminated.

DNA is next cut into fragments along its length. This is done by mixing the DNA with restriction enzymes. The enzymes cut the DNA in a specified way, by recognizing particular base pair combinations. The resultant pieces are called restriction fragments. Various enzymes have been developed for this purpose.

The restriction fragments are then separated according to size by a process called "agarose gel electrophoresis". A slab of gel, similar in consistency to gelatin, is prepared with

---

[6]This section is condensed and synthesized from William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va. L. Rev. 45, 64-76 (1989), *cited in, e.g., State v. Schwartz*, 447 N.W.2d 422, 425 (Minn. 1989); *People v. Castro*, 144 Misc. 2d 956, 959, 545 N.Y.S.2d 985 (Sup. Ct. 1989); *State v. Ford*, 301 S.C. 485, 489, 392 S.E.2d 781 (1990).

holes, or wells, at one end. The DNA fragments are placed in the wells, and an electric current is applied to the far end. The DNA fragments, which have a negative charge, move toward the positive electrode. The shorter fragments are able to negotiate the gel more quickly, while the longer fragments get caught at the top. When the current is turned off, the fragments are arrayed across the gel according to their lengths. Several samples of DNA can be run at one time. DNA fragments of known size are run next to the samples as markers to measure the final results against.

Because the gel is fragile and difficult to work with, the fragments are transferred onto a nylon membrane by a procedure called Southern blotting, named after its inventor. A sheet of the membrane is placed on top of the gel, and paper towels are heaped on top to draw liquid up and through the membrane. The DNA fragments attach to the membrane in the same position as they had been in on the gel. A chemical is added to cause the two strands of the DNA to separate (denaturing).

Now the DNA is amenable to analysis. One or more radioactive probes are placed on the membrane. These probes are specifically designed to attach to the polymorphic fragments that have been denatured. Because of the property of base pairing explained above, where only A's and T's or C's and G's can pair, the manufactured probes will attach to the denatured DNA in only one way. Again, an illustration may be helpful:

```
 s p s p s p s p s p s p s p s p s p s p s p s p s
  T   A   G   C   C   C   T   A   G   A   T   G   G
          |   |   |   |   |   |   |   |
(Probe)       G   G   G   A   T   C   T   A
```

Once the probe has attached, an autorad can be made. The membrane is placed on a piece of x-ray film, and the radioactive probe exposes the film. A pattern of bands is produced, which looks like a bar code, called a DNA print. Each band indicates a polymorphic site on the DNA which the probe was designed to find. Because the relative size of

the fragments is known by their position on the membrane, the locations of the polymorphic sites on the particular DNA being tested can be determined by the DNA print.

Finally, the results of two RFLP tests must be compared to see if the DNA prints match. For example, a suspect's blood can be compared to semen taken from a rape victim. Generally, the comparison is done by eye, and then the autorads are measured by hand with a ruler. These measurements can be converted to standard numerical values for record-keeping purposes.

■■ There seems to be little dispute that the underlying theory — that DNA exists and is unique — is accepted. William C. Thompson & Simon Ford, *DNA Typing: Acceptance and Weight of the New Genetic Identification Tests*, 75 Va. L. Rev. 45, 60 (1989) (hereinafter Thompson & Ford); *see also* Laurel Beeler & William R. Wiebe, Comment, *DNA Identification Tests and the Courts*, 63 Wash. L. Rev. 903, 939 (1988). For instance, Thompson & Ford, who are generally critical of DNA typing in forensics (and both testified for the defense in this case), have stated:

> There is nothing controversial about the theory underlying DNA typing. Indeed, this theory is so well accepted that its accuracy is unlikely even to be raised as an issue in hearings on the admissibility of the new tests.

Thompson & Ford, at 60.

The Committee commented specifically on the admissibility of DNA typing in *DNA Technology, supra*. The Committee stated that the principles discussed here are so well established that a court could take judicial notice of their acceptability:

> Assumption 1 — that, with the exception of identical twins, each person's DNA is unique — is so well established in human molecular genetics that a court is justified in judicially noticing it, even in the context of a *Frye* hearing.
> Assumption 2 concerns the validity of procedures for extracting DNA from samples of blood, semen, and other materials and analyzing it for the presence and size of polymorphisms. With regard to application in scientific research, the validity is sufficiently well established in the case of RFLP analysis with Southern blots that judicial notice is also appropriate.

*DNA Technology*, at 133. Because of the broad range of scientists involved in the Committee, it represents the sort of general scientific acceptance needed to satisfy *Frye*.

Testimony at the *Frye* hearing in this case supports this conclusion. Dr. Cotton, from Cellmark, testified that each step of the RFLP testing procedure was accepted in the scientific community. Dr. Concannon, a research scientist at Virginia Mason Research Center, Seattle, Washington, works in the area of immunology, researching the genetics of susceptibility to autoimmunities or immunodeficient diseases. He testified that he uses the RFLP procedure in his own lab, and that each step is generally accepted in the scientific community.

Dr. Schellenberg, a biochemist with the University of Washington School of Medicine, studies the human genetics of Alzheimer's disease. He testified that the principle that DNA is unique to each individual is absolutely accepted in the scientific community. He added that DNA "[i]s completely accepted as being the basis of [heredity] — it's completely characterized and accepted." Report of Proceedings, at 589. Dr. Schellenberg's research sometimes involves comparing two unknown samples to determine if they come from the same individual. He testified that the RFLP process is universally accepted, and that he knew of no dispute in the scientific literature.

Even defense experts agreed that the *general* scientific principles were accepted. For example, Dr. Ford, who criticized many of Cellmark's procedures, agreed with the statement that RFLP technology is fully accepted in the scientific community. Dr. Ford is a molecular biologist currently employed at the University of California. Dr. Libby, a geneticist at the University of Washington, also agreed that RFLP analysis is universally accepted in the scientific field.

In addition, no court has rejected RFLP testing on the basis that it was not generally accepted by the scientific community. Indeed, the majority of courts deciding the issue have found such evidence to be admissible. *See, e.g., United States v. Jakobetz*, 955 F.2d 786 (2d Cir. 1992); *Snowden v.*

*State*, 574 So. 2d 960 (Ala. Crim. App. 1990); *State v. Pennell*, 584 A.2d 513 (Del. Super. Ct. 1989); *Martinez v. State*, 549 So. 2d 694 (Fla. Dist. Ct. App. 1989); *People v. Miles*, ___ Ill. App. 3d ___, 577 N.E.2d 477 (1991); *State v. Brown*, 470 N.W.2d 30 (Iowa 1991); *Smith v. Deppish*, 248 Kan. 217, 807 P.2d 144 (1991); *Cobey v. State*, 80 Md. App. 31, 559 A.2d 391, *cert. denied*, 317 Md. 542 (1989); *State v. Davis*, 814 S.W.2d 593 (Mo. 1991); *People v. Shi Fu Huang*, 145 Misc. 2d 513, 546 N.Y.S.2d 920 (Cy. Ct. 1989); *State v. Pennington*, 327 N.C. 89, 393 S.E.2d 847 (1990); *State v. Ford*, 301 S.C. 485, 392 S.E.2d 781 (1990); *State v. Wimberly*, 467 N.W.2d 499 (S.D. 1991); *Kelly v. State*, 792 S.W.2d 579 (Tex. Ct. App. 1990), *aff'd*, 824 S.W.2d 568 (Tex. Crim. App. 1992); *Spencer v. Commonwealth*, 238 Va. 275, 384 S.E.2d 775, 84 A.L.R.4th 293 (1989).[7]

Even those courts which have ultimately determined that the proffered evidence was not admissible have commented that the principle underlying DNA typing was generally accepted. For example, the court in *Commonwealth v. Curnin*, 409 Mass. 218, 220, 565 N.E.2d 440, 441 (1991) stated: "Everyone agrees that the underlying theory and at least the general processes used by Cellmark are accepted in the scientific community." *See also State v. Schwartz*, 447 N.W.2d 422, 426 (Minn. 1989) ("we agree that DNA typing is generally acceptable . . ."); *State v. Woodall*, 182 W. Va.

---

[7]We note that the Legislature enacted a statute pertaining to DNA after this case was decided in the trial court. RCW 43.43.752-.758 sets forth a plan to establish a statewide DNA typing system. The Legislature's findings agree with our holding:

The legislature finds that recent developments in molecular biology and genetics have important applications for forensic science. It has been scientifically established that there is a unique pattern to the chemical structure of the deoxyribonucleic acid (DNA) contained in each cell of the human body. The process for identifying this pattern is called "DNA identification."

The legislature further finds that the accuracy of identification provided by this method is superior to that of any presently existing technique and recognizes the importance of this scientific breakthrough in providing a reliable and accurate tool for the investigation . . . of sex offenses . . . and violent offenses . . ..

Laws of 1989, ch. 350, § 1, at 1748.

15, 22, 385 S.E.2d 253 (1989) ("reliability of [DNA] tests is now generally accepted by geneticists, biochemists, and the like."); *People v. Castro*, 144 Misc. 2d 956, 963, 545 N.Y.S.2d 985 (Sup. Ct. 1989) ("there is general scientific acceptance of the theory underlying DNA identification.").

Cauthron contends, however, that the RFLP test should not be admitted because it is fraught with potential problems. The commentaries provide several examples of the sorts of problems that arise. Contamination of the sample, or degradation due to passage of time, are commonly mentioned. Thompson & Ford, at 93. Partial digestion of the fragments when applying the restriction enzyme, or its converse "star activity", which occurs when the restriction enzyme cuts in too many places, can also create problems with the autorad. Human error can cause problems, *e.g.*, samples can be cross-contaminated, or loaded onto the gel wrong. Thompson & Ford, at 93-95. In one proficiency study, conducted by the California Association of Crime Laboratory Directors in 1987, a laboratory technician at Cellmark compared two samples and declared a match in error. The original sample had been too large to handle in one batch, and in the course of testing, two test tubes were confused. Thus, the comparison that was ultimately made was of the sample to itself. *See* Janet C. Hoeffel, Note, *The Dark Side of DNA Profiling: Unreliable Scientific Evidence Meets the Criminal Defendant*, 42 Stan. L. Rev. 465, 493 (1990); Thompson & Ford, at 92 n.207.

While these problems are of concern, they do not require excluding the evidence altogether. Once the general underlying principles are accepted, as they are here, then both the proponents and opponents of a particular test should be able to garner the necessary information to present both sides of the issue to the factfinder. Any remaining questions about the reliability of the particular tests in this case should be examined under the standards for admissibility of expert testimony, which is within the trial court's discretion.

Here, the jury was allowed to hear expert testimony for the State and the defendant. Dr. Cotton testified extensively

to the jury about the process Cellmark used here. The requirements of ER 702 were met: Dr. Cotton was amply qualified as an expert; as discussed above, the opinion is based on an accepted scientific theory; and, clearly, this evidence was helpful to the jury. Two other state experts testified along the same lines. Additionally, the defense had the opportunity to thoroughly cross-examine. Cross examination addressed both the possibility for error in the laboratory here and the errors made in the California proficiency test. Moreover, the defense presented its own experts to rebut the State's conclusions. Dr. Ford and Dr. Libby both testified that they found the autorads in this case inconclusive, and discussed their reasons at length. In addition, they each pointed out the possible pitfalls of DNA testing, such as degradation, starring, cross contamination, etc., and the lack of controls employed in the testing procedure. The jury was presented with a balanced picture of the DNA evidence.

In sum, a review of the applicable sources and the record in this case yields ample evidence that DNA typing meets the *Frye* test of admissibility. We hold that DNA typing is generally accepted in the relevant scientific community. In addition, we hold that the problems raised by the defense concerning the quality of the autorads in this case go to the weight rather than the admissibility of the testimony. The jury was in a position to evaluate the evidence fairly because of the care with which it was presented.

## III
### STATISTICAL EVIDENCE

In addition to the RFLP test, however, Cauthron specifically challenges the use of population statistics in DNA analysis on two grounds. First, Cauthron contends that the testimony presented to the jury that Cauthron's DNA "matched" the semen samples taken from the victims was inadmissible. Second, Cauthron argues that the statistical evidence presented at the *Frye* hearing was invalid.

Further explanation of the analytical technique involved is necessary to understand those arguments. The critical

inquiry is this: once it has been determined that two auto-rads match, what is the likelihood that the suspect and the evidence from the crime scene have the same source?

All scientists agree that if autorads are distinguishable, then they do not come from the same individual. Thus, DNA typing yields evidence which has the potential to exculpate innocent people. However, the experts disagree as to the criteria necessary to conclude that similar ("matching") auto-rads come from the same person. As the Committee stated:

> DNA "exclusions" are easy to interpret: if technical artifacts can be excluded, a nonmatch is definitive proof that two samples had different origins. But DNA "inclusions" cannot be interpreted without knowledge of how often a match might be expected to occur in the general population. Because of that fundamental asymmetry, although each new DNA typing method or marker can be used for investigation and exclusion as soon as its technical basis is secure, it cannot be interpreted with regard to inclusion until the population frequencies of the patterns have been established.

*DNA Technology*, at 75.

There is no doubt that if the technology existed to analyze the entire length of DNA and compare it to another complete DNA molecule, an absolute identification could be provided. This is because each individual's DNA is unique, with the exception of identical twins. The RFLP test, however, does not detect the entire DNA strand. It focuses on the specific locations (loci) detected by the probes used in a particular test. Although there are a very large number of sites on the DNA which vary from one person to another (approximately 3 million), only a small percentage of the overall number of positions on the human genome are variable (0.1 to 0.3 percent of 3 billion). Eric S. Lander, *Population Genetic Considerations in the Forensic Use of DNA Typing, in 32 Banbury Report: DNA Technology and Forensic Science* 143, 143-46 (Jack Ballantyne et al. eds., 1989); *DNA Technology*, at 74. Thus, it is imperative that the probes used actually detect sites which are variable or polymorphic, and not those which are the same for each human being.

The field of population genetics is concerned with the theories and applications involved in making predictions

about population characteristics. In making an estimate of the probability that a defendant's DNA is the same as that taken from the crime scene, the expert relies on a previously constructed database. Lorne T. Kirby, *DNA Fingerprinting* 171 (1990). The database is developed to test the probes used by the particular lab. As stated above, without such a database, there is no way to determine if a probe is detecting an allele which is common to all human beings, or a hyper-variable site on the DNA. The more variations that a given site has, the more useful it is as an investigative tool.

Indeed, the fact that one autorad matches another has no meaning without the statistical evidence to back it up. If the autorad reflects only monomorphic sites, it imparts no information whatsoever about the defendant. In other words, if the probes used only detect sites on the DNA which are common to all human beings, the evidence obtained cannot be the basis for identifying the defendant. Thus, the expert must also show that the alleles detected by the particular probes used are polymorphic. This showing requires that a sufficient database — a large enough and truly random sample — be the basis of the expert's conclusions.

In addition, in order to make claims about probabilities which are of the high magnitudes usually seen in DNA cases, the experts rely on the product rule. The scientist first collects the data pertinent to each allele being compared. Based on the statistics derived from the database, the expert determines the probability that a sample of known origin will match (on an autorad) the given sample. That probability will vary from one allele to another. For instance, allele A may be found in 1 of every 10 people; allele B found in 1 of 20; and allele C found in 1 of 5. Under the product rule, if there is a match for each allele, the expert can multiply ($1/10$ x $1/20$ x $1/5$) to achieve the result that only 1 person in 1,000 will match all three sites.

However, "the scientific validity of the multiplication rule depends on whether the events (i.e., the matches at each allele) are actually statistically independent." *DNA Technology*, at 76. That is, the product rule cannot be applied where

the three alleles are related, because that increases the likelihood that anyone who has one of the three has all of them. For example, suppose that A, B, and C are all related to having red hair, fair skin, and freckles. If the possibility of having these traits is interrelated, then anyone who has A is more likely to have B and C, and the multiplication is not valid — instead of a 1 in 1,000 chance of a match it may be only a 1 in 20 probability.

Two central theoretical principles involved in statistical analysis of DNA typing have provoked serious questions. First, it is assumed that each of the probes used detects an allele which is independent of the other alleles tested. That is, in calculating the statistics, the scientist attempts to ensure that the various sites tested are not related to each other. This requirement is referred to in the literature as "linkage equilibrium". It has not been sufficiently established that the various probes used detect independent alleles. Various scientists have raised concerns that the databases used do not adequately address the problem of population substructures.

Second, it is assumed that the statistical calculations are based on a truly random population — one which mates randomly and thus mixes the gene pool evenly. This assumption is known as "Hardy-Weinberg equilibrium". However, it is not yet agreed that the databases used are either sufficiently random or sufficiently developed for any particular group being tested.

Our role is not to evaluate the merits of the theory or of the empirical evidence. Nonetheless, it is important that we understand the extent of any controversy in the scientific community. Although it is not our aim to make a judgment regarding which view is correct, we must be sure that a genuine and important controversy exists. Our decision rests on the existence of a controversy, not on its resolution.

The Committee acknowledged that the area was not settled:

> Substantial controversy has arisen concerning the methods for estimating the population frequencies of specific DNA typing

patterns. Questions have been raised about the adequacy of the population databases on which frequency estimates are based and about the role of racial and ethnic origin in frequency estimation.

(Footnote omitted.) *DNA Technology,* at 74-75.

At a conference held at the Cold Spring Harbor Laboratory, Eric S. Lander presented a paper which expresses these concerns. Lander, at 143. After setting out the basic methodology discussed above, Lander identifies four underlying assumptions, any one of which he notes would "completely invalidate the analysis". Lander, at 145.

First, Lander points out the importance of correctly identifying the population with which to compare the sample. Lander, at 145. Because of "genetic drift", small populations may have distinct genetic differences. Although racial classification helps with this problem, it does not draw fine enough distinctions among groups. Second, the sample used in the database must be large enough to account for the possibility of error. When dealing with very rare events, such as where the frequency of a given allele is 1 in 500, small errors are more significant. Lander, at 146-47. Third, in a related matter, the sample must be truly random. Lander, at 147-48.

Finally, and most importantly, the population must be mixed such that each locus (position of the DNA tested) is in Hardy-Weinberg equilibrium, and such that the loci together are in linkage equilibrium. Lander, at 148. Lander explains the problem as follows:

> These assumptions are true, however, only if the population is homogeneously mixed. Let us illustrate the point with an extreme example. Suppose that (1) a distinct ethnic minority comprised 10% of the population studied; (2) the minority group members all shared the same allele at each of three RFLP loci tested (i.e., the minority was not polymorphic but monomorphic at these loci); and (3) the particular alleles found in the minority were absent in the rest of the population. In this case, a population study would find that each minority allele had a population frequency of 10%. Applying the cookbook approach [the product rule], the probability of an individual being homozygous for all three minority alleles would be calculated at 1 in 1,000,000. If we did not know that the true genotype frequency was 1 in 10 (since all minority members share the

genotype), we might be persuaded to convict the first minority suspect on the basis of the perfect DNA match.

Lander, at 148.

To solve the problem, the expert must be relatively certain that the alleles detected are in equilibrium — that they represent "a random selection from the overall pool." Lander, at 149. Short of testing all the subpopulations of the United States for population substructures, the scientist can use various statistical methods to determine whether equilibrium exists in the database they are relying on. Although no one disagrees that Hardy-Weinberg is theoretically sound, "there seems to be a serious misperception that Hardy-Weinberg equilibrium is a law of physics that *must* apply to a population." Lander, at 149. The expert must show more than the theory. For the evidence to be admitted, the theory must be valid in application. In fact, "there is no reason to expect that the loci are in Hardy-Weinberg equilibrium in such heterogeneous groups as Caucasians, blacks, and Hispanics. Indeed, some early studies are finding statistically significant deviations from Hardy-Weinberg equilibrium, indicating the presence of genetically distinct subgroups." Lander, at 149.

Lander's concerns are bolstered by additional sources found in the scientific literature. *See* R.C. Lewontin & Daniel L. Hartl, *Population Genetics in Forensic DNA Typing*, 254 Sci. 1745, 1747 (1991); Lorne T. Kirby, *DNA Fingerprinting* 175-76 (1990) (citing J.E. Cohen, *DNA Fingerprinting for Forensic Identification: Potential Effects on Data Interpretation of Subpopulation Heterogeneity and Band Number Variability*, 46 Am. J. Hum. Genetics 358 (1990)). The legal literature also reflects concerns about population statistics. *See* Richard Lempert, *Some Caveats Concerning DNA as Criminal Identification Evidence: With Thanks to the Reverend Bayes*, 13 Cardozo L. Rev. 303 (1991); Michael J. Saks & Jonathan J. Koehler, *What DNA "Fingerprinting" Can Teach the Law About the Rest of Forensic Science*, 13 Cardozo L. Rev. 361 (1991).

On the other hand, scientists have noted the utility of. these statistical principles in a forensic setting:

> If single-locus multiallele DNA analysis is used, this is comparable to but considerably more specific than conventional blood classification typing. When a match is observed, the probability that the match could have arisen by chance in the population must be calculated. Population allele frequencies and the frequencies of the loci genotypes must be known. Provided Hardy-Weinberg and linkage equilibria apply, the probabilities for the loci matched can be multiplied to determine the composite profile probability. The value of match evidence, in conjunction with other evidence, can be very incriminating especially if a number of loci are analyzed and rare alleles are present.

Kirby, at 172; see also Ranajit Chakraborty & Kenneth K. Kidd, *The Utility of DNA Typing in Forensic Work*, 254 Sci. 1735 (1991).

Courts in other jurisdictions have expressed reservations about statistical evidence in DNA cases. In *Curnin*, the Massachusetts Supreme Court held that Cellmark's statistical assumptions were incorrect, and thus the evidence was inadmissible. *Commonwealth v. Curnin*, 409 Mass. 218, 227, 565 N.E.2d 440 (1991). After considering the testimony of Dr. Laurence Mueller, the court in *Curnin* found that there was disagreement within the scientific community about the validity of the population studies used, the consequences of using very rare alleles, and the utility of the product rule. *Curnin*, at 226-27. Thus, the court held that "[b]ased on the absence of the general acceptance or inherent rationality of the process" the admission of the probability evidence was prejudicial error. *Curnin*, at 227. *See also People v. Pizarro*, 10 Cal. App. 4th 57, 12 Cal. Rptr. 2d 436 (1992); *People v. Barney*, 8 Cal. App. 4th 798, 10 Cal. Rptr. 2d 731 (1992); *State v. Pennell*, 584 A.2d 513, 522 (Del. Super. Ct. 1989); *Caldwell v. State*, 260 Ga. 278, 393 S.E.2d 436 (1990); *Commonwealth v. Lanigan*, ___ Mass. ___, 596 N.E.2d 311 (1992); *State v. Schwartz*, 447 N.W.2d 422, 428 (Minn. 1989); *State v. Vandebogart*, 136 N.H. 365, 616 A.2d 483 (1992); *State v. Anderson*, ___ N.M. ___, 853 P.2d 135 (Ct. App. 1992), *cert.*

*granted*, 848 P.2d 531 (1993); *People v. Mohit*, 153 Misc. 2d 22, 579 N.Y.S.2d 990 (Cy. Ct. 1992). *Cf. People v. Atoigue*, DCA No. CR 91-95A, S.C. No. CF0023-91, 1992 WL 245628 (D. Guam App. Div. Sept. 11, 1992) (denying admissibility of DNA test results due to lack of general acceptance in scientific community, but holding admission of statistics harmless error).

The expert testimony here did not provide any probability statistics. Instead, four experts testified that Cauthron's DNA "matched" the semen samples taken from the victims. Dr. Cotton testified that: "The defendant Richard Cauthron using our test is the source of the semen sample in the five cases that we got the result on. His pattern matches the pattern from the semen stain in those cases." Report of Proceedings, at 2045. In fact, Dr. Cotton testified that the DNA could not have come from anyone else on earth. On redirect, she stated that she had "no doubts about that identification." Report of Proceedings, at 2167.

Similarly, Ms. Corey testified that Cauthron "was the donor of the semen in those five cases." Report of Proceedings, at 2223. She based her opinion on her testimony that there was a "match" in each case. Dr. Schellenberg and Dr. Diane Durnam, a molecular biologist, also each testified that the samples "matched". The State rested without presenting any evidence of population statistics.

■ This testimony should not have been admitted, because it does not meet the test for expert testimony. As stated above, expert testimony is admissible only when the underlying scientific principle satisfies the threshold *Frye* requirements *and* the testimony meets the 2-part test of ER 702: (1) the witness qualifies as an expert and (2) the expert testimony would be helpful to the finder of fact. Several courts have commented on the usefulness of the type of evidence presented to the jury here — testimony that there was a "match", without the background probability information. In *Curnin*, 409 Mass. at 222 n.7, the court noted:

> It is apparent from the basis on which we decide the DNA testing issue that we would not permit the admission of test

results showing a DNA match (a positive result) without telling the jury anything about the likelihood of that match occurring.

The Supreme Court of Alabama has made a similar observation:

> Stated simply, the evidence necessary to show a "match" does not by itself indicate the frequency with which a given DNA pattern might occur statistically or might occur in a given population; to establish population frequency generally requires data on the relevant populations involved as well as data for the mathematical, statistical analysis.

*Ex parte Perry*, 586 So. 2d 242, 254 (Ala. 1991). The Committee's view supports the conclusions reached in the courts:

> To say that two patterns match, without providing any scientifically valid estimate (or, at least, an upper bound) of the frequency with which such matches might occur by chance, is meaningless.

*DNA Technology*, at 74.

Because the testimony presented did not include the background probability information, it was insufficient. The Committee recommends that: "[r]egardless of the calculated frequency, an expert should — given with the relatively small number of loci used and the available population data — avoid assertions in court that a particular genotype is unique in the population." *DNA Technology*, at 92. Testimony of a match in DNA samples, without the statistical background or probability estimates, is neither based on a generally accepted scientific theory nor helpful to the trier of fact.

In addition, the testimony is not supported by the evidence presented at the *Frye* hearing. Although Dr. Cotton testified that the methods employed by Cellmark are generally accepted, her testimony was not borne out by the other witnesses. One of the State's own witnesses, Dr. Wijsman, even testified that Cellmark incorrectly computed certain statistics. Defense experts also pointed out various problems. For example, Dr. Mueller, a population geneticist, testified that it had not been shown that the statistical database was representative of the general population (*i.e.*, that it was in Hardy-Weinberg equilibrium). Dr. Geisser, a statistician, argued that when the standard deviation used by

Cellmark is applied to each of the eight bands matched here, the probability of a perfect match is 1 in 100, a much more likely event than the probability claimed by Cellmark. These opinions are in accord with the scientific literature discussed above.

Although we are convinced that the testimony presented at trial was improper, and thus requires reversal, we are encouraged by the Committee's findings and recommendations.

> Although mindful of the controversy, the committee has chosen to assume for the sake of discussion that population substructure may exist and provide a method for estimating population frequencies in a manner that adequately accounts for it. Our decision is based on several considerations:
>
> 1. It is possible to provide conservative estimates of population frequency, without giving up the inherent power of DNA typing.
>
> 2. It is appropriate to prefer somewhat conservative numbers for forensic DNA typing, especially because the statistical power lost in this way can often be recovered through typing of additional loci, where required.
>
> 3. It is important to have a general approach that is applicable to any loci used for forensic typing. Recent empirical studies pertain only to the population genetics of the VNTR [variable number of tandem repeats] loci in current use. However, we expect forensic DNA typing to undergo much change over the next decade — including the introduction of different types of DNA polymorphisms, some of which might have different properties from the standpoint of population genetics.
>
> 4. It is desirable to provide a method for calculating population frequencies that is independent of the ethnic group of the subject.

*DNA Technology*, at 80. The Committee goes on to set out a method for accounting for the possibility of population substructuring, called the ceiling principle. *DNA Technology*, at 82-83. It also adopted several recommendations for collecting databases, and for estimating population frequencies in the period of time prior to the adoption of the ceiling principle. *DNA Technology*, at 89-93. Although we lack the scientific expertise to either assess or explain the methodology, its adoption by the Committee indicates that sufficient acceptance within the scientific community has been achieved to satisfy *Frye* in appropriate circumstances.

We reverse the conviction, and remand for a new trial.[8] On remand, the trial court should take additional expert testimony[9] to determine if the empirical evidence utilized by Cellmark is valid under the criteria set forth by the Committee prior to allowing an expert to testify about the results in Cauthron's case.

## IV
### ADDITIONAL CLAIMS

Cauthron argues that the evidence obtained when he was first detained on October 14, 1988, including the gun, gloves and mask and blood drawn, must be suppressed. He claims that the detention was more than permitted as an investigatory stop, and that since he was never formally placed under arrest, the ensuing search is not valid.

This argument lacks merit in several respects. First, the police had probable cause to arrest when they found the defendant hiding in some bushes outside a fast-food restaurant at 2:45 in the morning with his genitals exposed. *Cf. State v. Chiles*, 53 Wn. App. 452, 456, 767 P.2d 597 (1989). Second, the police discovered the artifacts partially concealed under the bushes in a public place. Defendant had no expectation of privacy in the property.

Cauthron also argues that the testimony concerning those items amounts to evidence of prior bad acts. The "prior bad acts" here are the circumstances of the arrest. However, the trial court expressly excluded reference to defendant's

---

[8]Because we reverse Cauthron's conviction, we do not reach the various discovery issues raised in this case. On remand, we recognize the defense's need to have access to materials pertaining to Cellmark's database and statistical analysis. The trial court, however, retains ample discretion to protect all the interests involved. CrR 4.7(h).

[9]Cauthron has argued that he is entitled to additional compensation for the experts he presented at the *Frye* hearing and at trial. However, our review of the record shows that the trial court only authorized funding for two experts to a maximum of $5,000, and specifically warned defense counsel that he might be proceeding at his own risk by presenting additional experts. The trial court allowed partial or full compensation for all the experts. We find no abuse of discretion in this payment plan.

indecent exposure at the time of the arrest, and allowed only testimony concerning the items which were found with him. The record does not support Cauthron's claim.

Cauthron further contends that he was denied his right to a speedy trial. CrR 3.3(c)(1) provides, in part: "A defendant not released from jail pending trial shall be brought to trial not later than 60 days after the date of arraignment."

CrR 3.3(h)(2) provides that a continuance may be granted on the State's motion "when required in the administration of justice" so long as the defendant will not be substantially prejudiced thereby. Such continuances are excluded from the 60-day time period. CrR 3.3(g)(3). Trial in the allotted time is not constitutionally required, and the trial court has discretion to grant continuances. *State v. Hoffman*, 116 Wn.2d 51, 77, 804 P.2d 577 (1991). Here, the continuances were necessary to obtain the required evidence. Moreover, defense requested and was granted continuances as well. No harm was done to defendant's case in the interim. Cauthron's right to a speedy trial was not violated.

Finally, Cauthron argues that the trial court erred in imposing an exceptional sentence. Exceptional sentences were imposed on two counts. One of these victims was 14, and the other 16. The court relied on three factors to impose an exceptional sentence: deliberate cruelty, victim vulnerability, and multiple acts of rape against an individual victim.

The reviewing court asks three questions: (1) Are the reasons given supported by the record? (2) Do the reasons justify a departure? and (3) Is the sentence clearly excessive? *State v. Dunaway*, 109 Wn.2d 207, 218, 743 P.2d 1237, 749 P.2d 160 (1987). The standard of review for the trial court's factual findings is clearly erroneous. *State v. Nordby*, 106 Wn.2d 514, 517-18, 723 P.2d 1117 (1986). Here, the victims were forced to submit to being photographed and were threatened with publication of the pictures. Moreover, the victims' youth rendered them exceptionally vulnerable to assault. In addition, both were raped multiple times. A sen-

tence of 136 months, taking the circumstances into account, is not an abuse of discretion.

In sum, we affirm the trial court's ruling that RFLP testing is admissible. However, we conclude that it was error to admit the testimony of a "match" since it was not accompanied by valid probability statistics. We therefore reverse the conviction and remand for further proceedings in accordance with the foregoing.

BRACHTENBACH, DOLLIVER, ANDERSEN, SMITH, GUY, and JOHNSON, JJ., concur.

DORE, C.J. (dissenting) — I dissent. DNA testing is not reliable; it does not pass the *Frye* standard; and it is not admissible. In order for novel scientific evidence to be admissible in court, it must be generally accepted in the scientific community. *Frye v. United States*, 293 F. 1013, 1014, 34 A.L.R. 145 (D.C. Cir. 1923); *State v. Martin*, 101 Wn.2d 713, 719, 684 P.2d 651 (1984). The novel scientific evidence in this case is DNA fingerprinting. This method of identification is based on the scientific principle that no two persons, except identical twins, have matching DNA. Clearly, the relevant scientific community accepts this principle as conceptually accurate. It follows that, if DNA fingerprinting could accurately show that a DNA sample taken from a crime scene matches a defendant's DNA, it would be strong inculpatory evidence.

DNA fingerprinting may be conceptually accurate, but it is plagued by two problems. First, although whole DNA molecules from different persons cannot match, portions of DNA recur in some persons. Second, the technology does not exist to test an entire DNA molecule; rather, tests can only evaluate individual sections of DNA molecules at a time. Majority, at 900. This is significant because the fact that one section of a DNA sample matches another has no meaning without knowing the statistical probabilities of that match occurring. Majority, at 901; *see Commonwealth v. Curnin,*

409 Mass. 218, 222 n.7, 227, 565 N.E.2d 440 (1991). In the present case, accurate statistical probabilities are not available. Scientists compute statistical probabilities from DNA databases. The databases currently used by scientists, however, are not generally accepted by the scientific community. Rather, they are the subject of significant debate. Majority, at 902-03. The fact that these databases are not accepted in the scientific community is central to a *Frye* analysis.

As the majority states, the core concern of *Frye* is whether the evidence being offered is based on accepted scientific methodology.

> This involves both an accepted theory and a valid technique to implement that theory. . . . any remaining concerns about the possibility of error or mistakes being made in the case at hand can be argued to the factfinder.

Majority, at 889. The inability to compute statistical probabilities accurate enough to be accepted by the relevant scientific community is not merely a "possibility of error" such as mixing up DNA samples during an experiment. On the contrary, it is an inherent flaw in the scientific methodology, and it is because of this flaw that the majority should have held that DNA fingerprinting was inadmissible.

Instead of holding the evidence inadmissible, however, the majority sidestepped the statistical probabilities issue by dividing the DNA fingerprinting theory into two parts, the underlying theory and the statistical analysis. In doing so, the majority was able to shield DNA fingerprinting from the controversy surrounding statistical probabilities and hold that at least the underlying theory met the *Frye* standard. The majority then dispensed with the statistical issue by holding that it did not affect admissibility; it only went to the weight afforded the evidence by the jury.

The majority's holding is correct only in that if accurate statistical probabilities were available, those probabilities would go to the weight of the evidence. In this case, however, the databases from which the probabilities are computed are the subject of debate, and without those databases the scien-

tific methodology is useless. It follows that the majority's holding that the underlying principle of DNA fingerprinting meets *Frye* is irrelevant. The theory that no two DNA molecules are identical is only the first part of the scientific methodology. The second part, a valid technique to implement that theory, simply does not pass the *Frye* standard.

Although scientists may develop an acceptable statistical database in the future, the contemporary statistical probabilities are still the subject of significant scientific debate. Until such time, I would hold that the testing does not pass the *Frye* admissibility standard. I dissent.

UTTER, J., concurs with DORE, C.J.